Harold Birns, J.
INTRODUCTION
Following 10 days of meticulous examination beginning on September 17, 1974, 12 jurors and four alternate jurors were selected for the trial of William Phillips, charged in an indictment with two counts of murder and one count of attempted murder. Forty-four witnesses, including the defendant, testified at the trial.. On November 21, after seven weeks of testimony, the jury returned its verdict that the defendant was guilty as charged. The evidence to support the jury’s finding of guilt was overwhelming. Sentence was set for December 19.
Defendant now moves to set the verdict aside under the provisions of CPL 330.30 (subd 2), asserting that during the trial there occurred such juror misconduct and prosecutorial misconduct as to warrant the relief sought. Thus, this court is not now confronted with a challenge to the sufficiency of the evidence against the defendant. It is concerned, however, with a tangential attack designed to upset the jury’s verdict.
For the reasons stated below, the motion, in all respects, is denied. The alleged misconduct does not meet the requirements of the CPL.
Prior to the court’s charge on November 20 and following summations the previous day, upon information first disclosed by the prosecutors on November 18, a hearing was held, in camera, concerning Juror No. 6, Mr. Lawrence Bethel. On October 4, the trial prosecutors, Messrs. Jack Litman and Philip La Penta, had obtained unverified information that Mr. Bethel had been arrested on a narcotics charge, a misdemeanor. It was not immediately known, but subsequent inquiry established, that he had been arrested on February 1, *615 1974, arraigned in the Criminal Court on February 2, and that he had then undertaken to co-operate with the office of the Special Narcotics Prosecutor in seeking the conviction of the alleged seller of the said narcotics. The charge against Mr. Bethel had been ACD’d, i.e., adjourned in contemplation of dismissal because of his promise of co-operation (see CPL 170.55).
Mr. Litman explained that the information concerning Mr. Bethel had not been disclosed earlier because the information had not only to be verified but it was also necessary to obtain the stenographic record of Mr. Bethel’s interrogation on the voir dire prior to the trial to determine whether the questions put to him then in any way related to this newly acquired information, and that there was considerable delay in obtaining such stenographic minutes.
- At the hearing, Mr. Allen Alpert, an assistant to the Special Narcotics Prosecutor, testified that he was an observer at the Phillips’ trial on October 4, and that he believed he recognized juror Bethel as a person in whom his office had an interest. Shortly thereafter, he gave the information concerning Mr. Bethel to Mr. Litman.
Mr. Bethel, summoned from the juryroom (and thereafter not permitted to return), testified that he had not disclosed his arrest upon voir dire because he believed the charges against him were no longer pending and were of no consequence. In fact, it appeared that no question put to Mr. Bethel at that time required him to provide any information concerning his arrest or its surrounding circumstances (People v Rosen, 251 App Div 584). Mr. Bethel also testified that at no time did he disclose to any of his fellow jurors the fact of his arrest or his promise to co-operate with the authorities.
A defense motion for a mistrial was denied, and thereupon Mr. Litman, the defense counsel Mr. Rothblatt, and the defendant in person expressly consented to the discharge of Mr. Bethel, although defense counsel reserved the right to make further inquiry into the matter, stating he intended to call the police officer, Douglas Brussel, who had arrested Mr. Bethel, to explore the promise of co-operation by Mr. Bethel and whether such co-operation in any way "tainted” the jury. Mr. Bethel’s place in the jury box was taken by Mr. Robert F. Thompson, the alternate, whose name "was first drawn and called” (CPL 270.35, subd 1).
Following the declaration of the jury’s verdict, defense *616 counsel specifically requested a further hearing concerning Mr. Bethel. December 9 was set for that purpose. Police Officer Brussel and Mr. Bethel were to appear on that date. In fact, Mr. Brussel on that occasion testified that he learned in June or July from Assistant District Attorney Alpert that Mr. Bethel would co-operate against the alleged seller, but he never saw Mr. Bethel after the arraignment in Criminal Court or spoke to him since that time.
This court is satisfied beyond a reasonable doubt (Chapman v California, 386 US 18, discussed infra, p 632) that at no time did Mr. Bethel disclose to any of his fellow jurors the fact of his arrest or of his promise of co-operation. To no degree was the jury "tainted” by Mr. Bethel. There was no misconduct by Mr. Bethel. The substitution of the alternate for Mr. Bethel, consented to by the defendant, prevented any prospective prejudice to the defendant. The belated disclosure concerning Mr. Bethel can be attributed in part to the delay in obtaining his voir dire minutes and perhaps to trial pressures on the prosecutors. However that may be, the delay itself in supplying this information, although protracted, in no manner constituted prosecutorial misconduct, as will be seen, under the provisions of the CPL (CPL 330.30, subd 2).
At the commencement of the proceedings on December 9, District Attorney Richard Kuh, again in camera, in the presence of defendant and defense counsel and others, made the following statement: On December 4, he had learned for the first time that during the trial of Mr. Phillips a letter had been received by his office on October 23 from one John Dana Smith seeking employment as an investigator. It developed that Mr. Smith was Juror No. 3 at the Phillips’ trial. The letter, addressed to District Attorney Kuh’s office, read as follows: "I understand that a federally funded investigative unit is being formed in your office to investigate major felonies. I wish to apply for a position as an investigator.” Attached to the letter was a résumé containing biographical information concerning Mr. Smith. District Attorney Kuh proceeded to outline the history of the letter from the time of its receipt until its disclosure in court.
Defense counsel requested and was granted an immediate hearing concerning the letter and the failure of the trial prosecutors to disclose its existence during the trial. A hearing was held in open court (CPL 330.40, subd 2, par [f]). Decision was reserved. It is noted that the law places upon the defend *617 ant "the burden of proving by a preponderance of the evidence every fact essential to support the motion” (CPL 330.40, subd 2, par [g]).
FACTS
The testimony elicited at the hearing revealed the following unprecedented chain of events:
After being selected and sworn as a juror on September 23, Mr. Smith lunched with Criminal Court Officer Rudolph Fontaine, who had attended the John Jay College of Criminal Justice with Mr. Smith’s wife. They discussed jobs in law enforcement. Mr. Fontaine told Mr. Smith of opportunities for persons with investigative backgrounds in the District Attorney’s office. Mr. Smith evinced interest.
Mr. Fontaine then inquired of Investigator Mulderig of the District Attorney’s office, whom he knew, as to the procedure for filing applications for investigators’ positions for himself and a friend. Mr. Johanssen, Mr. Mulderig’s superior, verified the procedure. At no time did Mr. Fontaine mention Mr. Smith or his status as a juror. However, he did relate the information obtained to Mr. Smith. Mr. Smith’s letter was mailed on October 22 and Mr. Fontaine submitted his own letter of application.
Mr. Smith’s letter found its way to the desk of Assistant District Attorney Conboy, an administrative assistant, who, upon returning from vacation, referred it on or about November 9 to Miss Joan Sudolnik, an assistant in charge of the major felony program in the District Attorney’s office. She was seeking to employ investigators. In routine fashion she turned the letter over to her subordinate Mr. Lang, who noted on a memo that an appointment should be made with the applicant Mr. Smith. Up to that point no one in the District Attorney’s office knew or had reason to know that the applicant was a juror in a pending criminal trial. Supreme Court Officer Mario Piazza saw Mr. Smith and Mr. Fontaine at a luncheonette during the trial and voluntarily undertook to learn the name of the person in charge of hiring investigators and was told by Mr. Lang on a subsequent date that it was Miss Sudolnik. Mr. Fontaine sought to learn from Assistant District Attorney Holmes, whom he knew, the progress of Smith’s letter of application and his own. In conversation he told Mr. Holmes that Mr. Smith was a juror in the Phillips case and raised the question, for the first time, whether such an application was *618 proper. Mr. Holmes,, thought it sufficiently questionable to immediately inform his supervisor Mr. Lankier of the pending application and, in addition, promptly told Miss Sudolnik what he had learned. This occurred November 13.
Upon ascertaining that indeed there was an application from Mr. Smith and that Mr. Smith was a juror in the Phillips case, Miss Sudolnik immediately attempted to communicate with Mr. Litman, but could not reach him until the following day, November 14. Incredulously, Mr. Litman heard the information about Mr. Smith and also was told that no action was taken upon the application. Mr. La Penta was present. Mr. Litman directed Miss Sudolnik to make no response at all to Mr. Smith’s application, with which direction she complied. On Friday night, November 15, Mr. Holmes met Mr. La Penta in a restaurant and began to tell him of the Smith letter of application. Mr. La Penta did not want to hear any mention of it at that time and place.
When Mr. La Penta and Mr. Litman discussed this extraordinary development, they concluded that all that was required of them in the circumstances of the trial was to permit no contact to develop with this juror concerning the letter of application. That posture continued until after the jury’s verdict was returned. It was developed that neither Mr. Lit-man nor Mr. La Penta sought advice from any superior or colleague with respect to Mr. Smith’s letter. It is obvious, however, that Mr. Smith’s presence on the jury was now known to many persons within and without the District Attorney’s office.
On December 4, following an unsuccessful habeas corpus proceeding initiated by defendant in the United States District Court, Southern District of New York, Mr. La Penta told Mr. John Keenan, Chief Assistant District Attorney, of Mr. Smith’s letter of application. Mr. Keenan promptly investigated all the circumstances surrounding this application and made the results known to District Attorney Kuh without delay. Mr. Kuh promptly and properly disclosed the facts as he knew them concerning the letter of application and the result of Mr. Keenan’s investigation to the defense and the court, as stated hereinabove.
In evaluating the testimony, this court finds that despite the probing and exhaustive examination of each and every witness at the hearing, there is no evidence which to any degree points to a. conclusion that any member of the District Attor *619 ney’s staff, particularly Mr. Litman, Mr. La Penta, or any court officer, had a sinister or dishonest motive with respect to Mr. Smith’s letter of application, or sought to gain thereby an unfair advantage over the defendant.
We turn, first, to the defense claim that Juror No. 3 was guilty of such improper conduct that the jury’s verdict should be set aside. Specifically, it is claimed that Mr. Smith’s desire to obtain employment in the District Attorney’s office during the trial meant that under no circumstances would his verdict be other than guilty, because his success in obtaining such employment depended upon the return of a guilty verdict, and thus the defendant was denied his constitutional right to a fair trial.
Of course, no such conclusion is warranted from a mere reading of the letter.
Whether such a conclusion is warranted at all requires an examination of all the facts and circumstances disclosed at this hearing.
A review of the voir dire examination of Mr. Smith is helpful in assessing this claim. On his voir dire examination Mr. Smith made the following declarations: 1. that he was a store detective employed by Bloomingdale’s for one year, from 1972 to 1973; 2. that his wife studied criminology at the John Jay College of Criminal Justice; 3. that he, Mr. Smith, following his expected graduation from the Columbia University School of General Studies, in October, planned to obtain employment in Federal Drug Enforcement overseas, in cooperation with local [foreign] authorities (and had already applied for such employment); 4. that he had, as store detective, made a number of arrests and on many occasions had cooperated with the New York County District Attorney’s office; 5. that his wife had been the victim of a crime, that she had been stabbed, sustaining serious injuries, and that her assailant had been prosecuted by the New York County District Attorney’s office.
The continuing interest of the juror in law enforcement was acknowledged by defense counsel and he gave it his attention in the following questions put to Mr. Smith:
"Q. Mr. Smith, I’m just a little curious here, I’m going to use the term that you are in a peculiar situation on this case. You’ve sort of been on the side of the law and law enforcement, making arrests for Bloomingdale’s and now you are about to be appointed with a law enforcement agency with the *620 Federal Government. Obviously in this case Bill Phillips is being accused and being prosecuted by the District Attorney’s Office, and members of the Police Department in the City of New York, who are a central part of law enforcement — and I’m sure you are aware from your background of what you know — that Bill Phillips sits here in this case just like in every case; and our system of law says that he’s presumed to be innocent. Now, do you feel that in this particular case, in spite of your experience, that the term presumption of innocence, as applies in this case, is not just theoretical, but the real meaningful law? Will you be able to keep that in mind?
"A. I will do that, and Mr. Rothblatt, let me say that the reason, as I mentioned before, my ex-boss steered me to the Federal Drug Enforcement Agency for legal experience. At this time, I wouldn’t be able to go to law school. In the near future, after serving with the Drug Enforcement Agency, I could go to law school. At this time, I’ve just had enough college atmosphere.
"Q. You want a little sabbatical?
"A. Ultimately, that is what my plans would be.
"Q. In other words, law enforcement is an intermediate step?
"A. It’s all part of the same package, but it’s in the legal and justice system.”
It is also noted that the juror declared to the trial prosecutor that he would be "a fair and impartial juror in the case”, and to Mr. Rothblatt he stated that if he had a reasonable doubt of the defendant’s guilt he would have no hesitancy in returning a verdict of not guilty.
Despite his predilection for law enforcement in connection with his personal ambitions, Mr. Smith was accepted by the defense without challenge for cause. He was thereupon duly sworn as a juror in the case.
At the posttrial hearing conducted by this court, Mr. Smith testified that he learned of a job opportunity in law enforcement from an acquaintance, Criminal Court Officer Fontaine, whose acquaintance he renewed after assuming his role as a juror. He testified he never discussed the Phillips’ case with Fontaine. When he learned from Mr. Fontaine the procedure in which an application could be forwarded to the District Attorney’s office, he gave his letter and reésumé to Mr. Fontaine, who mailed it. He admitted that this act was *621 imprudent, but asserted that his verdict in no way was conditioned upon the hope of employment by the District Attorney. He testified, "I am willing to take a rap for naivete.” He stated to Mr. Rothblatt, "I swore on oath to listen to the evidence and to render a verdict on that evidence. I did so.” Further, "To imply that I worked the jury’s mind is repugnant to me and to the other jurors.” To a question whether the hope of employment would have in any way affected his verdict, he said, "That didn’t enter my mind; I didn’t think about it that way.” Mr. Smith made no inquiry as to the progress of his letter of application until after the verdict, when for the first time he called Miss Sudolnik. She told him then she would look into the matter but never again communicated with him.
Mr. Rothblatt also inquired as to a conversation post verdict between Mr. Smith and his former supervisor at Bloomingdale’s. Mr. Smith’s testimony with respect to this was as follows: "A He [Reilly] said, "Did you really think the guy was guilty?’ and I said yes, he was guilty as hell. He [Reilly] said, 'Was there a long deliberation?’ I said, 'No it wasn’t a very long deliberation.’ That was the extent of it.” Mr. Smith also discussed the progress of his application with Mr. Reiily, who had originally suggested to Mr. Smith that he seek a job with law enforcement (see voir dire of Juror Smith).
The defense has failed to establish that Mr. Smith’s letter of application in any way reflected a prejudice, hostility, or premature determination as to the defendant’s guilt (United States v Brown, 79 F2d 321). In no way did the letter reflect a state of mind on the part of this juror other than that acknowledged by the defense when it accepted the juror. As stated, Mr. Smith’s predilection for law enforcement was well known to the defense and hence may not be used belatedly as a basis for challenge posttrial (People v Mack, 35 App Div 114; People v Smith, 169 NYS 837; see, also, People v Cosmos, 205 NY 91,103).
From all the evidence adduced, this court finds that it was Mr. Smith’s faith in his own integrity, in his own ability to render a verdict on the evidence, which permitted him to send his letter of application to the District Attorney and ignore the possible construction which might be placed upon such action. As will be seen, the act of sending the letter did not constitute improper conduct within the meaning of CPL 330.30 (subd 2).
*622 We now turn to the additional defense claim that the trial prosecutors were guilty of improper conduct so as to deny the defendant a fair trial.
Specifically, it is asserted that their failure to inform defense counsel and the court of Mr. Smith’s letter of application interfered with a substantial right of the defendant, i.e., a right to a fair and impartial jury and, in addition, if there had been such disclosure, the defendant then had a right under such circumstances to challenge Mr. Smith and have him removed from the jury before deliberations began (CPL 270.35, subd 2).
As stated earlier, the letter of application was called to the attention of Mr. La Penta on November 14. The dilemma which then concerned the prosecutors was summarized in Mr. La Penta’s testimony when he recalled saying to Mr. Litman, "What the hell do you do in a situation like this?”
After reflection, the prosecutors concluded that Mr. Smith’s expressed desire in the letter to obtain employment in a Federally funded program in the District Attorney’s office was in no way inconsistent with the ambitions he unmistakably declared in the voir dire. They concluded that under these circumstances Mr. Smith had not engaged in any act of misconduct as to require them to bring knowledge of his letter to the attention of the court or defense counsel; that their prosecutorial responsibility would be met if the District Attorney’s office deliberately and assiduously avoided any further communication with Mr. Smith with respect to the letter of application.
They also reasoned that because there had been no dialogue between Juror Smith and the District Attorney’s office, as there had been between Juror Bethel and the office of the Special Narcotics Prosecutor, the absence of bilateral communication justified nondisclosure.
THE LAW
JUROR MISCONDUCT
CPL 330.30, as far as applicable to this case, provides: Motion to set aside verdict, grounds for.
"At any time after rendition of a verdict of guilty and before sentence, the court may, upon motion of the defendant, set aside or modify the verdict or any part thereof upon the following grounds: * * *
*623 "2. That during the trial there occurred, out of the presence of the court, improper conduct by a juror, or improper conduct by another person in relation to a juror, which may have affected a substantial right of the defendant and which was not known to the defendant prior to the rendition of the verdict”.
Under this section it appears that within certain time requirements (which have been met in this case) a verdict may be set aside on motion of the defendant only when there was improper conduct on the part of a juror which may have affected a substantial right of the defendant, or only when there has been improper conduct by another person in relation to a jury which may have affected a substantial right of the defendant, and such conduct was not known to the defendant prior to the jury’s verdict. This section of the CPL is derived from subdivisions 2, 3, and 4 of section 465 of our former Code of Criminal Procedure (see Denzer, Practice Commentaries, McKinney’s Cons Laws of NY, Book 11 A, p 13).
Subdivisions 2, 3 and 4 of section 465 of our former Code of Criminal Procedure read as follows: "The court in which a trial has been had upon an issue of fact has power to grant a new trial, when a verdict has been rendered against the defendant, by which his substantial rights have been prejudiced, upon his application in the following cases * * * 2. When the jury has received any evidence out of court * * * 3. When the jury * * * have been guilty of any misconduct by which a fair and due consideration of the case has been prevented; 4. When the verdict has been decided * * * by any means other than a fair expression of opinion on the part of all the jurors”.
It would appear our former Code of Criminal Procedure empowered the court to grant a new trial when the jury was "guilty of any misconduct,” but only where the defendant’s "substantial rights have been prejudiced” and only where such misconduct "prevented” a fair and due consideration of the case” (People v Cocco, 305 NY 282, 287, dissenting opn, Fuld, J.).
Upon comparison, the thrust of both sections appears to be similar; that is, upon defendant’s motion a jury’s verdict may be vitiated where a defendant’s substantial rights have been adversely affected by juror misconduct which would prevent a fair and due consideration of the case.
*624 To interpret properly the current provisions of the CPL which permit a jury’s verdict to be set aside, it will be necessary then to consider cases which were decided in similar instances under our former Code of Criminal Procedure. But first it will prove helpful to note the observations of recognized commentators on the subject of criminal law.
It is not every act of misconduct by a jury which will require a court to vacate a verdict; only those acts which impair a defendant’s right to a fair and due consideration of the case by a jury will compel judicial interposition between verdict and sentence.
It is stated: "It is ordinarily improper for jurors to communicate with outsiders during the trial or during deliberations, although such communications will not vitiate the verdict where nonprejudicial”. Further, "It has been held * * * that it is not misconduct which will vitiate the verdict or require a mistrial for jurors to communicate with outsiders where nothing is said about the case, at least in the absence of prejudice, and that proof of communications concerning the case between a juror and an outsider will not vitiate the verdict where no prejudice resulted, or where the remark of a juror to an outsider was not such as to show the bias, injury, or premature conclusion of the jury as claimed (23A CJS, Criminal Law, § 1364).
Another commentator, in summarizing findings, has made the general observation: "Not every irregularity which would subject a juror to censure should overturn the verdict. In order to authorize the setting aside of a verdict on account of misconduct of a juror, it must appear that such misconduct may have had an influence upon the final result and caused injury to the complaining party.” (5 Wharton, Criminal Law and Procedure, §§ 21, 22.)
These statements are in accord with New York law. To give a sampling of cases, for example: Where jurors were observed in conversation with a court reporter during recess, it could not be shown that this irregularity influenced the verdict or prejudiced the defendant’s rights (People v Catalanotte, 67 Misc 2d 351). Where a juror observed to his colleagues that the defendant on trial for robbery resembled members of a family he formerly knew with a reputation for being "tough”, this statement was held not to have prejudiced the defendant so as to warrant a new trial (People v Thompson, 198 NY 396). Where a juror read from a copy of the Penal Law and *625 the Code of Criminal Procedure and exhibited those volumes to the jury during deliberations, and where, in another case, a jury obtained a copy of the revised statutes while deliberating on a verdict, it was held in each case that the irregularity did not vitiate the verdict unless it could be shown that the defendant was prejudiced thereby (People v Priori, 164 NY 459; People v Draper, 28 Hun 1). "[A]n irregularity or indiscretion of a jury is not of itself sufficient to warrant a new trial. More must be shown * * * The irregularity or indiscretion must be of such a nature as prevented fair and due consideration of the case” (People v Catalanotte, supra, p 353).
On the other hand, in a case where a defendant, a foreigner, was tried for murder and testified in his own behalf, and where it was established, without dispute, that a juror stated he would not believe a person of such nationality under oath, this continuing prejudice was held to deny defendant a fair trial. The verdict of guilty was vacated as a nullity (People v Leonti, 262 NY 256). The fact that a juror had a racial prejudice against the accused was held to deprive the defendant of a fair trial (People v Whitmore, 45 Misc 2d 506, revd on other grounds 27 AD2d 939). Where jurors made unauthorized visits to the scene of alleged crimes, such action constituted the jurors witnesses against the respective defendants, thus depriving the particular defendant of Sixth Amendment rights, i.e., the right to be confronted by such witnesses (People v De Lucia, 20 NY2d 275; People v Crimmins, 26 NY2d 319; see, also, Parker v Gladden, 385 US 363). Where a juror concealed a personal bias against the defendant, the defendant’s right to a fair trial by an impartial jury was adversely affected (People v Harding, 44 AD2d 800). In recognition of the fundamental rights to which a defendant is entitled in the administration of criminal law, it has been emphasized "a defendant has a right to a trial by a fair and impartial jury” (People v DeLucia, supra, p 278).
Thus, in determining whether alleged misconduct by a juror should warrant a new trial, it must be demonstrated that the fundamental right to a fair and impartial assessment of the facts were frustrated. This is always a crucial issue where juror misconduct is asserted.
Federal Jurists have considered similar problems. A reference to two cases in the Southern District will suffice. In United States v Brown (79 F2d 321, supra), during the pendency of a trial, a juror obtaining a haircut was asked by his *626 barber how the trial was going and whether the defendant would be convicted. He answered, "I think so.” This indiscretion was held not to show, as claimed, "a premature conclusion by the juror” as to the defendant’s guilt so as to deprive the defendant of a fair trial. "It * * * was not an expression of a separate opinion to which a juror might feel himself committed; it was merely a forecast of the verdict, which could hardly be more than a provisional guess.” (See opn Learned Hand, J., p 324.)
The case of People ex rel. Moore v Fay (238 F Supp 1005, 1007) is most instructive on the issues before this court. Following a verdict in a State court convicting the defendant Moore of manslaughter, it was disclosed that during the trial a juror, in violation of instructions not to discuss the case with others, communicated with his own attorney as to the propriety of a question asked by counsel during the trial. Judge Edward Weinfeld of the United States District Court, in denying habeas corpus relief sought by the defendant, observed (p 1007): "There can be no doubt that the juror’s communication with the third party violated the Court’s expressed instruction, in consequence of which the juror’s name was stricken from the jury list. However, not every violation by a juror of the Court’s instructions with respect to third party communications, nor every irregularity in a juror’s conduct, automatically compels the declaration of a mistrial, the replacement of a juror, or the vacatur of a judgment of conviction. The dereliction must be such that it may be said to deprive the parties of the continued objective and disinterested judgment of the juror, thereby foreclosing a fundamentally fair trial. This is not a case where a third party communicat.es with a juror with overtones of bribery, coercion, tampering, shadowing or other conduct which carries with it a presumption of prejudice. Here, the juror, seemingly in doubt as to the prosecution’s action and the Court’s ruling, himself initiated the communication. In and of itself, the incident did not suggest any prejudicial attitude toward the defendants.” Cases have been cited by the defendant which spell out a dialogue or bilateral communication between a juror and third parties where the respective court believed the matter to be of such moment as to set a verdict aside (Tableporter v Urist, 157 Misc 347; Pekar v United States, 315 F2d 319).
On the other hand, in a prosecution for passing a fictitious *627 check, a casual conversation between a trial prosecutor and a juror in a courtroom corridor, in plain view of bystanders, was held not to be such misconduct as to require the setting aside of the jury’s verdict (People v Newell, 192 Cal 659).
In the case at bar no dialogue or bilateral communication between Juror Smith and representatives of the District Attorney’s office has been established. The direction of Mr. Litman to Miss Sudolnik not to respond to the letter effectively encapsulated the communication. There was nothing in the letter which in any way was inconsistent with the ambitions expressed by the juror in the voir dire, which were acknowledged and accepted by the defense. Mr. Smith’s letter was indeed an indiscretion but, in the light of his voir dire, in no way reflected a premature conclusion as to the defendant’s guilt, or prejudice against the defendant, or an inability to consider the guilt or innocence of the defendant solely on the evidence.
PROSECUTORIAL MISCONDUCT
We turn now to the issue of prosecutorial misconduct as claimed by the defense. The decision not to disclose the job application of Juror Smith was made by Mr. Litman, with six trial weeks behind him and summation a week away, with knowledge of the looming problem of Juror Bethel and at a time when the defendant had just completed his fourth day of cross-examination by Mr. Litman.
Mr. Litman believed that he met his professional responsibility by ignoring Mr. Smith’s letter and advising his associates in the District Attorney’s office to do the same.
The standards of the American Bar Association provide: "If counsel suspects * * * juror misconduct he should, of course, report it to the court” (American Bar Association, Standards Relating to the Prosecution Function and the Defense Function, commentary to § 5.3, p 116).
The standards of the New York State Bar Association provide: "Because of his duty to aid in preserving the integrity of the jury system, a lawyer who learns of improper conduct by or towards * * * a juror * * * should make a prompt report to the court regarding such conduct” (Code of Professional Responsibility, EC 7-32).
Mr. Litman and Mr. La Penta, in their testimony, explained that they did not view Mr. Smith’s letter as "juror miscon *628 duct,” and it appears that they were correct. But undoubtedly, it was questionable conduct, and, under the circumstances, this court and defense counsel should have been made aware of it during the trial, as they were made aware of it on December 9.
It was a serious error in judgment, although there may be room for a contrary opinion (People v Cocco, 305 NY 282, supra, [see dissenting opn, Fuld, J., p 287]; see, also, United States v Kyle, 469, F2d 547). The Assistant District Attorneys were quasi-judicial officers holding a special status in the administration of criminal law. As prosecutors, they were "not [to be] the judge of what is unduly prejudicial to the government or the defense” (United States v Kyle, supra, p 552 dissenting opn of Bazelon, Ch. J.). Certainly prosecutors are to be held to a higher standard than that required of ordinary laymen (cf. Meinhard v Salmon, 249 NY 458). Had they not permitted the pressures of the case to becloud their professional vision, there would be no need for this hearing, the occurrence of which has proved inevitable.
Moreover, the juror could have been excused by consent, or an application for a discharge of a juror could have been made by defense counsel (see People ex rel. Moore v Fay, 238 F Supp 1005, supra). Whether at the time this court would have ruled to excuse the juror on grounds specified in our CPL (§ CPL 270.35) is now beside the point, but will be discussed hereinafter. Alternates were available to replace up to four jurors, who for one reason or another might be unable to sit until the conclusion of the trial.
However we are not now concerned with the resolution of a question of professional ethics. We are considering a definite narrow legal issue, i.e., whether the failure to disclose Mr. Smith’s letter of application constituted "improper conduct by another person in relation to a juror,” and if so, may it "have affected a substantial right of the defendant” (CPL 330.30, subd 2).
From a mere reading of the statute one may readily conclude that the phrase "improper conduct by another person in relation to a juror” was designed to meet the problem of "jury tampering”; that is, affirmative action by a third person directed toward a juror with intent to affect a jury’s verdict (for examples of such conduct see People v Cocco, 305 NY 282, supra; People v Sher, 24 NY2d 454).
In the Cocco case, a discharged alternate in a public restau *629 rant, during the time the sequestered jury was about to dine, informed a juror that he heard the defendant on trial for a felony ran "a sporting house.” Despite the juror’s disclaimer that her judgment was in no way impaired as a result of this conversation, the verdict of guilty was set aside, the Court of Appeals concluding that the defendant’s right to a fair trial was adversely affected.
In another case, during the taking of testimony in a trial of a defendant charged with murder, several jurors received anonymous communications by telephone disparaging the defendant. The trial court, after determining that each recipient of a call could render a fair and impartial verdict on the evidence, refused to set aside a verdict convicting the defendant. The judgment of conviction was affirmed (People v Sher, supra). It is not necessary to analyze the rationale distinguishing the contrary result in each case. The point is that in each case it was affirmative activity by a third party in relation to a juror which brought into question whether the sanction of law should be imposed.
It is claimed by the defense that the failure of the trial prosecutor to disclose Mr. Smith’s letter amounted to "improper conduct by another person in relation to a juror.” Such omission to disclose cannot be equated with jury tampering. The challenged behavior of the prosecutors focuses upon an omission to act in relation to a juror rather than some positive deliberate step by the prosecutors designed to influence the jury’s verdict. Accordingly, this court cannot hold in this instance that there was prosecutorial misconduct within the meaning of the CPL [CPL 330.30, subd 2].
The defense also contends that the failure to disclose Mr. Smith’s letter during trial deprived it of the opportunity to challenge the juror during trial.
The CPL permits, under certain circumstances, the discharge of a juror during trial where the juror’s continued presence on the jury is attacked (CPL 270.35, subd 2). If it is shown "that a juror has engaged in misconduct of a substantial nature but not of a kind to require the declaration of a mistrial pursuant to subdivisions one and two of section 280.10, the court may,” if an alternate juror is present, "discharge such * * * juror” and replace him with the appropriate alternate.
It is not any misconduct of a juror which may require a change in the jury’s composition, but "misconduct of a sub *630 stantial nature” which would not require the declaration of a mistrial under conditions specified in another section of the CPL (CPL 280.10).
Under CPL 280.10 (subd 1), a defendant may move for a mistrial prior to the jury’s deliberation only when "there occurs during the trial an error or legal defect in the proceedings, or conduct inside or outside the courtroom, which is prejudicial to the defendant and deprives him of a fair trial.”
To warrant a mistrial on a defendant’s motion, the conduct complained of must "so clearly [deprive the defendant] of a fair trial that it would require a reversal on appeal of a prospective judgment of conviction” (see Denzer, Practice Commentaries, McKinney’s Cons Laws of NY, Book 11A, CPL 280.10, p 521, citing People v Byrne, 17 NY2d 209; People ex rel. Costello v La Valle, 13 AD2d 601; People v Montlake, 184 App Div 578).
While the degree of misconduct required to merely excuse a juror under attack during trial (CPL 270.35, subd [2]) appears to be less than that which would warrant mistrial sought by a defendant (CPL 280.10, subd 1), nevertheless to remove a juror during trial, his misconduct must be found to be substantial. It necessarily follows that such misconduct must be of such import as to affect adversely the ability of the juror to sit fairly and impartially assess the issues on trial.
The conduct of Mr. Smith in sending his letter of October 22, as shown hereinbefore, in no way deprived the defendant of a fair trial so as to warrant the declaration of a mistrial on defendant’s motion under CPL 280.10. Nor did that act amount to misconduct of a substantial nature which would, in the light of his answers during his voir dire examination, require him, ipso facto, to be excused under CPL 270.35 (subd [2]). To no degree did the letter have such import in relation to the issues at the trial so as to demonstrate Mr. Smith’s hostility or prejudice to the defendant or a premature determination of the defendant’s guilt (United States ex rel. Moore v Fay, 238 F Supp 1005, supra; United States v Brown, 79 F2d 321, supra). It was, at most, an irregularity. Had the receipt of the letter been disclosed at the trial, in the absence of a consent by the District Attorney to excuse Mr. Smith as a juror, defendant’s motion challenging the right of Mr. Smith to continue to sit as a juror would necessarily have to be denied as a matter of law.
*631 CONCLUSION
Each such case must be considered in the light of its own facts and circumstances (United States v Betner, 489 F2d 116). "[W]hen jury misconduct is alleged in a defendant’s motion for a new trial, the trial judge has a duty to take the following actions: he must conduct a full investigation to ascertain whether the alleged jury misconduct actually occurred; if it occurred, he must determine whether or not it was prejudicial; unless he concludes that it was clearly not prejudicial, he must grant the motion for a new trial; if he concludes that it did not occur or that it was clearly not prejudicial, he must spell out his findings with adequate specificity for meaningful appellate review.” (United States v McKinney, 429 F 2d 1019, 1026.)
Only for the most compelling reasons should a jury verdict be set aside (McDonald v Pless, 238 US 264; Tanner v Stim, 66 Misc 2d 1030; People v Maynard, 80 Misc 2d 279).
It would be manifestly improper to permit a tangential posttrial attack of insufficient strength to overcome the verdict in this case, which rests upon so firm a factual foundation.
More particularly, it would be manifestly improper to invalidate the verdict here merely because of unprecedented imprudence on the part of a juror or unique misjudgment of the trial prosecutors as to the requirement of professional ethics, where no prejudice to the defendant’s substantial rights has been shown and substitution for such juror during trial most likely would not have altered the result (cf. United States v Keogh, 391 F2d 138, 148). As has been stated in another connection, "A defendant is entitled to a fair trial but not a perfect one” (Lutwak v United States, 344 US 604, 619).
Aware that the present application for a new trial under CPL 330.30, like its predecessor section 465 of the Code of Criminal Procedure, is addressed to the sound judicial discretion of the Trial Judge, this court is of the opinion, from the testimony adduced at this hearing, that the defendant’s substantial rights were not prejudiced.
Although our CPL specifies that the defendant has the "burden of proving by a preponderance of the evidence every fact essential to support the motion” (CPL 330.40, subd 2, par [g]), it is noted that the defendant’s claim that he was denied his right to a fair trial is one of constitutional dimension (US *632 Const, 6th Amdt; NY Const, art. I, § 6). Accordingly, this court holds, as it is required to do under such circumstances, that it is satisfied beyond a reasonable doubt that the "irregularities” established were harmless and did not contribute to the verdict in this case (Chapman v California, 386 US 18, supra, citing Fahy v Connecticut, 375 US 85; People v Catalanotte, 67 Misc 2d 351, supra).
The defendant’s motion is in all respects denied.