William R. PHILLIPS, Petitioner–Appellee,

v.

Harold J. SMITH, Superintendent, Attica Correctional Facility, Respondent–Appellant.

No. 1303, Docket 80–2099.

United States Court of Appeals, Second Circuit.

Argued June 16, 1980.

Decided Sept. 26, 1980.

Robert M. Morgenthau, Dist. Atty., New York County, New York City (Robert M. Pitler, Jerrold Tannenbaum, Asst. Dist. Attys., New York City, of counsel), for respondent–appellant.

William M. Kunstler, New York City, for petitioner–appellee.

Before OAKES, VAN GRAAFEILAND, Circuit Judges, and NICKERSON, District Judge *.

NICKERSON, District Judge:

This is an appeal from a judgment entered on the order of the District Court, Lawrence W. Pierce, Judge, granting petitioner William R. Phillips a writ of habeas corpus unless he is retried.

Phillips, a former New York City police officer, was indicted by a New York County grand jury on March 29, 1972 for the 1968 murders of a pimp and a prostitute and for the attempted murder of a customer of the bordello where the crimes occurred. In August 1972 Phillips' first trial ended in a hung jury, deadlocked, he claims, ten to two for acquittal. On November 21, 1974, after a second trial of some seven weeks, he was convicted on all three counts. The convictions were affirmed without opinion, *People v. Phillips*, 52 App.Div.2d 758, 384 N.Y.S.2d

* United States District Judge for the Eastern District of New York, sitting by designation.

715 (1st Dept.1976), and leave to appeal was denied. 39 N.Y.2d 949, 386 N.Y.S.2d 1039, 352 N.E.2d 894 (1976).

In April 1979 he commenced this habeas corpus proceeding, pursuant to 28 U.S.C. § 2254, asserting, among other things, that he had been denied due process because during the second trial one of the jurors, John Dana Smith, applied to the New York District Attorney's Office for a job as an investigator, a fact which the prosecutors knew but did not reveal to the trial judge or to Phillips' counsel. Judge Pierce conditionally granted the writ. *Phillips v. Smith*, 485 F.Supp. 1365 (1980).

Phillips' second trial commenced before New York State Supreme Court Justice Harold Birns on September 16, 1974. After ten days of voir dire, twelve jurors and four alternate jurors were selected. Although Smith indicated on voir dire an interest in pursuing a career in law enforcement, particularly with the federal government, he was not challenged by the defense and was chosen as juror number three.

On September 23, 1974, the day he was sworn as a juror, Smith had lunch with Criminal Court Officer Rudolph Fontane, who had attended John Jay College of Criminal Justice with Smith's wife. Fontane said that he was thinking of applying for a job as a rackets investigator in the District Attorney's Office and told Smith that a federally funded position for a major felony investigator had opened in that office. Smith said he was interested in the latter position.

Fontane made inquiries on behalf of Smith and himself as to the procedure for applying for a job as an investigator. He spoke first to Michael Mulderrig, an investigator in the District Attorney's Office, who said that an application and resumé should be sent directly to the District Attorney. Fontane learned the same thing from Mario Piazza, a jury warden for the New York Supreme Court, who had spoken about the matter to John Lang, an Assistant District Attorney. Fontane reported what he had

learned to Smith, and on October 22, 1974, after some three weeks of testimony, Smith wrote a letter to the New York County District Attorney's Office stating, "I understand that a federally funded investigative unit is being formed in your office to investigate major felonies. I wish to apply for a position as an investigator."

Smith gave his application to Fontane, assuming that Fontane would deliver it to a personal acquaintance in the District Attorney's Office. Instead, Fontane simply placed it in the mail, although he personally delivered his own application for the job of rackets investigator. Several days after the applications were submitted, Fontane met Smith and Piazza for lunch. Later that day or the next day, Piazza called Fontane and told him that Assistant District Attorney Joan Sudolnik was responsible for reviewing applications for employment in the Major Felony Program.

Smith's application was forwarded to the Administrative Assistant District Attorney, who, on his return from vacation on November 9, 1974, sent it to Sudolnik. Sudolnik referred the application to Lang. On November 13, 1974, Fontane met Assistant District Attorney Robert Holmes, spoke of Smith's application and mentioned for the first time to a member of the District Attorney's staff, the fact that Smith was on the Phillips jury. Holmes promptly told this to Sudolnik, who instructed both her secretary and Lang that no one should correspond with Smith until after the trial. The next day, November 14, 1974, Sudolnik met with Jack Litman, the Assistant District Attorney prosecuting Phillips, and his assistant Phillip LaPenta, and informed them of the situation.

Litman testified that he directed Sudolnik to make no response to the application and said that he did not wish to know about anything contained in Smith's resumé. Litman and LaPenta then decided that since Smith had revealed during the voir dire that he was interested in a career in law enforcement, there was nothing improper in the application to the District Attorney's Office. Moreover, they concluded that inas-

much as they had not learned anything about Smith that had not been disclosed on voir dire they had no duty to notify the court or defense counsel.

At that time four alternate jurors were available, and had Justice Birns known of the job application he would have had the discretion to substitute an alternate or, if no alternate had been available, to declare a mistrial. *See, e. g., People v. Genovese,* 10 N.Y.2d 478, 225 N.Y.S.2d 26, 180 N.E.2d 419 (1962); *People v. West,* 38 App.Div.2d 548, 327 N.Y.S.2d 493, *aff'd, sub nom. People v. DeLeon,* 32 N.Y.2d 944, 347 N.Y.S.2d 203, 300 N.E.2d 734 (1973). *See generally* N.Y. Criminal Procedure Law § 270.35.

One week later, on November 21, 1974, the jury rendered its verdict. Smith attempted to contact Sudolnik the next day by telephone. She was not available and did not return the call. He then asked Wallace Reilly, for whom Smith had worked as a guard in a department store, to make inquiries on his behalf. Reilly, who was acquainted with several Assistant District Attorneys, called Sudolnik, gave Smith a good recommendation, and mentioned that Smith had been on the Phillips jury. Sudolnik replied that Smith would be interviewed along with other applicants.

On December 4, 1974, LaPenta, concerned about public accusations made by Phillips' trial counsel against the prosecution, informed the Chief Assistant District Attorney about Smith's application. The District Attorney, Richard Kuh, was then notified, and on December 9, 1974 he brought the matter to the attention of the court and the defense.

Defense counsel moved to vacate the jury verdict. Justice Birns denied the motion after an extensive post trial hearing. *People v. Phillips,* 87 Misc.2d 613, 384 N.Y.S.2d 906 (Sup.Ct.N.Y.Cty. 1975).

Justice Birns concluded that there was "no evidence" that any member of the District Attorney's staff had a sinister or dishonest motive with respect to Smith's application, 87 Misc.2d at 618–19, 384 N.Y.S.2d at 910, and that sending the application, though "an indiscretion", 87 Misc.2d at 627,

384 N.Y.S.2d at 915, and "unprecedented imprudence", 87 Misc.2d at 631, 384 N.Y.S.2d at 918, did not constitute improper conduct by a juror under New York State law. In light of the voir dire revealing Smith's ambitions for a law enforcement career, Justice Birns found that the application "in no way reflected a premature conclusion as to the defendant's guilt, or prejudice against the defendant, or an inability to consider the guilt or innocence of the defendant solely on the evidence." 87 Misc.2d at 627, 384 N.Y.S.2d at 915.

Justice Birns also found that, although the prosecution should have informed the court and defense counsel of the application and although their failure to do so was "a serious error in judgment," 87 Misc.2d at 628, 384 N.Y.S.2d at 916, indeed, "unique misjudgment", 87 Misc.2d at 631, 384 N.Y.S.2d 918, as to the requirements of professional ethics, this failure was not such prosecutorial misconduct as to deprive Phillips of a fair trial or to prejudice his substantial rights.

In granting the writ, Judge Pierce held that, while there was insufficient evidence to support a finding that Smith was actually partial, he was impliedly biased because the "average" juror in his position "would indeed be likely to favor the prosecution's position–at least to some extent," 485 F.Supp. at 1372, and that Phillips was therefore held in violation of the Sixth Amendment as incorporated in the due process clause of the Fourteenth Amendment. *Duncan v. Louisiana*, 391 U.S. 145, 88 S.Ct. 1444, 20 L.Ed.2d 491 (1968).

Judge Pierce cited, among other authorities, *Tumey v. Ohio*, 273 U.S. 510, 532, 47 S.Ct. 437, 444, 71 L.Ed. 749 (1927), in which the Supreme Court, deciding that due process requires disqualification of a judge with a pecuniary interest in finding against a defendant, stated "[e]very procedure which would offer a possible temptation to the average man ... to forget the burden of proof required to convict the defendant, or which might lead him not to hold the balance nice, clear and true between the State and the accused, denies the latter due process of law."

Given the human propensity, often subconscious, for self–justification, as well as the "psychological impact" of requiring an individual to state before others whether he was fair and impartial, *Irvin v. Dowd*, 366 U.S. 717, 728, 81 S.Ct. 1639, 1645, 6 L.Ed.2d 751 (1961), it is at best difficult and perhaps impossible to learn from a juror's own testimony after the verdict whether he was in fact "impartial". Indeed, following a seven week trial any determination of something as amorphous as the feelings of a juror who has applied to the prosecutor for a job may be suspect. For these reasons, perhaps the law should apply the objective, prophylactic rule adopted by Judge Pierce. But we need not decide the point, for we are persuaded that, as contended by Phillips below and in the state courts, the failure of the prosecutors to disclose their knowledge denied him due process.

The requirements of disclosure which the due process clause imposes on a prosecutor have been dealt with in an analogous context in the line of cases commencing with *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). The *Brady* case held that suppression by the prosecution of evidence requested by the accused violated due process where the evidence was material to guilt or punishment, irrespective of the good or bad faith of the prosecution. The Court stated: "The principle ... is not punishment of society for misdeeds of a prosecutor but avoidance of an unfair trial to the accused. Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly." 373 U.S. at 87, 83 S.Ct. at 1197.

Subsequently, the opinion in *United States v. Agurs*, 427 U.S. 97, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976), reemphasized this commitment to "fairness" for the accused. The Court pointed out that the *Brady* rule arguably applies in three distinct situations.

The first involves the knowing use of perjured testimony by the prosecution. A conviction so obtained is "fundamentally

unfair", and must be set aside if there is "any reasonable likelihood that the false testimony could have affected the judgment of the jury." 427 U.S. at 103, 96 S.Ct. at 2397. *See also Giglio v. United States,* 405 U.S. 150, 92 S.Ct. 763, 31 L.Ed.2d 104 (1972); *Napue v. Illinois,* 360 U.S. 264, 79 S.Ct. 1173, 3 L.Ed.2d 1217 (1959). The opinion in the *Agurs* case stated that this standard of materiality is applied "not just because . . . prosecutorial misconduct" is involved, but more importantly because of the "corruption of the truth–seeking function of the trial process." 427 U.S. at 104, 96 S.Ct. at 2397.

The second situation, illustrated by the *Brady* case, is where the defense requests specific evidence. In those circumstances "if the subject matter of such a request is material, or indeed if a substantial basis for claiming materiality exists, it is reasonable to require the prosecutor to respond either by furnishing the information or by submitting the problem to the trial judge," and "the failure to make any response is seldom, if ever, excusable." 427 U.S. at 106, 96 S.Ct. at 2399.

The third situation is where, as in the *Agurs* case, there has been no specific request, in which event the prosecution has a duty to provide the defense with exculpatory evidence only if it "creates a reasonable doubt that did not otherwise exist." 427 U.S. at 112, 96 S.Ct. at 2402. Agurs had been convicted for murder of one Sewell who, just before the killing, had been carrying two knives, including the one with which Agurs killed him. Agurs' counsel moved for a new trial, asserting he had discovered that Sewell had a prior record, including two guilty pleas to carrying deadly weapons, apparently knives. The prosecutor had not been requested to disclose and had not disclosed this record to the defense.

The Supreme Court held that there was no denial of due process, approving the trial court's finding that this evidence did not create a reasonable doubt that did not otherwise exist. The evidence did not contradict the prosecution's case and was largely cumulative.

■ For purposes of the present case what is significant in the *Agurs* opinion is its indication that had Sewell's prior record been requested and withheld Agurs would have been denied due process. Thus the standard of due process is not whether the defendant in the court's opinion was in fact guilty. The test is whether the defendant has received "fair" treatment. By deciding that a request for specific evidence must be honored the court held that to sanction the withholding by the prosecutor of specified evidence as to which there is a substantial basis for claiming materiality would not only be unfair to the defendant but would also impugn the integrity of the judicial process itself.

We think similar considerations are applicable in this case. Here the defense had no reason to believe a juror had applied to the prosecutor for a job and therefore no reason to request such information. But an impartial jury is basic to a fair trial. *Irvin v. Dowd,* 366 U.S. 717, 722, 81 S.Ct. 1639, 1642, 6 L.Ed.2d 751 (1961). To condone the withholding by the prosecutor of information casting substantial doubt as to the impartiality of a juror, such as the fact that he has applied to the prosecutor for employment, would not be fair to a defendant and would ill serve to maintain public confidence in the integrity of the judicial process. As in *Rose v. Mitchell,* 443 U.S. 545, 555–56, 99 S.Ct. 2993, 3000, 61 L.Ed.2d 739 (1979), in which the convicted defendant alleged racial discrimination in the selection of the foreman of the grand jury, the "harm is not only to the accused" but "to society as a whole" when the "appearance of justice" is destroyed.

■ We may assume for purposes of argument that the trial judge might find after a hearing that the juror was of so staunch a character and of such extraordinary sensitivity and righteousness that his judgment would not be affected, even subconsciously, by his interest in his future employment. But it is not the prosecutor's function to predict what the court may find. His duty must be defined in objective terms. Where the facts indicate that an

average juror might be prejudiced and there thus is a fair likelihood that the trial judge will exercise his discretion to substitute an alternate or declare a mistrial, the prosecution must divulge the facts upon which the exercise of that discretion depends.

No doubt there will be cases in which the prosecution receives innocuous information regarding a juror. While the prudent prosecutor will no doubt err on the side of disclosure, we do not suggest that a new trial will be required in every case. We merely hold that the prosecutor may not keep silent when he knows that a juror has applied to become his employee.

The judgment is affirmed.

VAN GRAAFEILAND, Circuit Judge, (dissenting):

In affirming the judgment herein, my colleagues have done exactly what the Supreme Court has said should not be done. They have measured the constitutional obligation of due process "by the moral culpability, or the willfulness, of the prosecutor." *United States v. Agurs*, 427 U.S. 97, 110, 96 S.Ct. 2392, 2400, 49 L.Ed.2d 342 (1976). They hold that the failure of the prosecutor to disclose his knowledge of a juror's job application denied petitioner due process regardless of whether the judgment of the juror in question was in fact affected by his interest in future employment so as to deprive petitioner of a fair trial. I cannot subscribe to this unwarranted expansion of the habeas corpus powers of the federal courts.

In *Remmer v. United States*, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954), an FBI agent was sent into the jury room without the defendant's knowledge or consent to investigate a rumor concerning jury tampering. The Court recognized that sending an agent in to investigate a juror as to his conduct "is bound to impress the juror and is very apt to do so unduly." *Id.* at 229, 74 S.Ct. at 451. It ordered that the trial judge be directed to hold a hearing so as to determine whether the incident was prejudicial and harmful to the defendant

and if "it [was] found to have been harmful, to grant a new trial." *Id.* at 230, 74 S.Ct. at 452. Since *Remmer*, this has been the generally approved procedure where there are reasonable grounds to suspect jury improprieties. *See, e. g., United States v. Johns*, 615 F.2d 672, 676 (5th Cir. 1980); *United States v. Gross*, 614 F.2d 365, 368 (3d Cir. 1980); *Sullivan v. Fogg*, 613 F.2d 465, 467 (2d Cir. 1980). It was the procedure followed by the state court judge in this case.

The state judge held a hearing during which the challenged juror was examined. Following the hearing, the judge found that the juror was not prejudiced or hostile and had made no premature determination of the defendant's guilt; that instead the juror was honest and able to render a verdict on the evidence. The judge concluded that petitioner had not been deprived of a fair trial. The district court likewise found that the record did not support petitioner's claim that the letter–writing juror was partial to the prosecutor's case.

My colleagues say this makes no difference and approve the granting of a writ solely because they find the state prosecutor's conduct to have been reprehensible. However, reprehensible conduct by a state prosecutor which has not deprived the defendant of a fair trial does not warrant federal habeas corpus relief. *Fambo v. Smith*, 565 F.2d 233, 235 (2d Cir. 1977). Our right to review state court proceedings is "the narrow one of due process, and not the broad exercise of supervisory power that [we] would possess in regard to [our] own trial court." *Donnelly v. DeChristoforo*, 416 U.S. 637, 642, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974), *quoting DeChristoforo v. Donnelly*, 473 F.2d 1236, 1238 (1973).

New York State Supreme Court judges are obligated and fully qualified to supervise the trial conduct of state prosecutors. Unless a prosecutor's conduct has so prejudiced a defendant as to deprive him of a fair trial, section 2254 gives a federal judge no right to usurp the state judge's function. *Borodine v. Douzanis*, 592 F.2d 1202, 1209–12 (1st Cir. 1979). The purpose of habeas corpus "is not punishment of society for

misdeeds of a prosecutor but avoidance of an unfair trial to the accused." *Brady v. Maryland*, 373 U.S. 83, 87, 83 S.Ct. 1194, 1197, 10 L.Ed.2d 215 (1963).

I dissent.