Fuld, J.
The record leaves not the slightest doubt as to the defendant Genovese’s guilt of the crime of acting as a fight manager without having procured the required license (State Athletic Commission Law [L. 1920, ch. 912, as amd.], §§ 7, 33, as amd. and renum. by L. 1952, ch. 666) and, were it not for certain newspaper publicity attending the opening of the trial, we would affirm the judgment without comment. After a jury had been selected to try the defendant, several articles appeared in New York City dailies concerning him which revealed a callous disregard for fair trial requirements,[1] and the question which we must decide is whether the publication of these items, 2 of which were read by some of the jurors, influenced them and prejudiced the defendant. If they did, then, we would reverse even though the defendant’s guilt is clearly established.
Defense counsel brought the articles to the attention of the trial judge before any evidence had been offered and, on the strength of their contents, moved for a mistrial. The judge denied the motion, but stated that he would interrogate the jurors to ascertain whether any of them had read the newspaper accounts and, if they had, whether they had been influenced by them.
The ensuing examination, in which both the prosecution and the defense participated, revealed that of the 4 articles which had been published only 2 had been read by any of the jurors and that of the regular jurors and the 2 alternates 6 had not *481 read either of them. It also appeared, however, that the other 8 jurors had read all or part of one of the articles, though with varying degrees of care and attention. Of these 8, the court excused 2 when it appeared that what they had read might affect their thinking and influence their verdict.[2] **The remaining 6 jurors all declared, and unequivocally, that they had not been influenced by anything they had read and that they were able to arrive at a fair and impartial verdict. Although the defendant renewed his motion for a mistrial after the examination had been concluded, he noted a specific objection, in the course of the voir dire, only to the continued presence of Juror No. 10 on the jury.
No one will question the necessity for maintaining the inviolability of jury trials and our duty to assure them in the administration of justice. This, quite obviously, may be achieved only by having disinterested jurors whose judgments are based solely upon a consideration of competent proof received in open court. (See, e.g., Irvin v. Dowd, 366 U. S. 717; Matter of Murchison, 349 U. S. 133, 136; People v. Sprague, 217 N. Y. 373, 380; People v. McLaughlin, 150 N. Y. 365, 375.) Unfortunately, our problem is made more difficult in a society where crime and corruption are exploited by the press, and jurors are likely to be exposed and influenced, consciously or unconsciously, by the emotional impact of the exploitation. (See, generally, Note, Community Hostility and The Right to an Impartial Jury, 60 Col. L. Rev. 349; Note, Free Press; Fair Trial—Rights in Collision, 34 N. Y. U. L. Rev. 1278.)
This does not mean, though, that a juror is to be held partial or prejudiced and disqualified merely because he has read accounts in newspapers which reflect, even seriously, upon the defendant and his conduct. In recognition of the fact that few persons enter the jury box, at least for the trial of a well-publicized case, without knowing something about it, it has long-been the rule in this State that even one who has formed an opinion or impression of the defendant’s guilt or innocence may be selected to sit if he swears that he believes that it ‘ ‘ will not influence his verdict, and that he can render an impartial *482 verdict according to the evidence, and the court is satisfied, that he does not entertain such a present opinion or impression as would influence his verdict.” (Code Crim. Pro., § 376, subd. 2; see People v. Wolter, 203 N. Y. 484, 491; People v. McGonegal, 136 N. Y. 62, 66 et seq.; People v. Lubin, 190 App. Div. 339, 340, affd. 229 N. Y. 601; see, also, Irvin v. Dowd, 366 U. S. 717, 722-723, supra; Reynolds v. United States, 98 U. S. 144, 155-156; Commonwealth v. McGrew, 375 Pa. 518, 525-526; O’Mara v. Commonwealth, 75 Pa. 424, 427-428; Klinedinst v. State, 159 Tex. Cr. Rep. 510, 513-514, cert. den. 347 U. S. 930.)
The Code provision is clear and we have frequently had occasion to consider it. The McGonegal case (136 N. Y. 62, supra) reviews its history and the Wolter case (203 N. Y. 484, supra) illustrates its application. Indeed, the need for a rule such as that provided by our statute is indicated by what the Supreme Court stated in Irvin v. Dowd (366 U. S. 717, 722-723, supra):
“It is not required, however, that the jurors be totally ignorant of the facts and issues involved. In these days of swift, widespread and diverse methods of communication, an important case can be expected to arouse the interest of the public in the vicinity, and scarcely any of those best qualified to serve as jurors will not have formed some impression or opinion as to the merits of the case. This is particularly true in criminal cases. To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror’s impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court. [Cases cited.] ” (Emphasis supplied.)
In the present case, as is apparent from the above analysis of the examination of the jurors, 2 were excused, 6 had not read the news articles and the remaining 6 who had read them declared that they could arrive at an impartial verdict based solely on the evidence received in court. The trial judge is vested with a broad discretion in ruling on the issue of prejudice in such a situation and, having in mind all of the relevant factors, *483 it is clear that he did not abuse that discretion when he denied the defendant’s motion for a mistrial. (See People v. Lubin, 229 N. Y. 601, affg. 190 App. Div. 339, supra; Reynolds v. United States, 98 U. S. 144, 156, supra; People v. Malmenato, 14 Ill, 2d 52, 62-65; State v. Cunningham, 173 Ore. 25, 58-74; Ann., 31 A. L. R. 2d 417; cf. Marshall v. United States, 360 U. S. 310, 312.) [3] In reaching this conclusion, it is of some significance that the trial judge informed the jurors that they were to avoid any newspaper accounts of the trial and that they were to base their verdict solely on the evidence.
Although there is no need to discuss any particular juror, we add a few words concerning Juror No. 10, since the defendant voiced a specific objection to his continued sitting. He had read only one of the articles, was not sure which it was and remembered very little about it. What is of consequence is that he said that he understood that the account was simply a reporter’s product and that he was to consider nothing except the evidence presented and, in addition, he declared, without reservation, that what he had read would not influence him in any way.[4]
The present case bears no resemblance to Irvin v. Dowd (366 U. S. 717, supra), upon which the defendant relies in urging a denial of Federal, as well as State, due process (U. S. Const., 14th Amdt.; N. Y. Const, art. I, § 6). Six murders had been committed in the neighborhood of Evansville, Indiana, between December, 1954 and March, 1955. Shortly after Irvin’s arrest, the law enforcement officials issued press releases, which were highly publicized, stating that Irvin had confessed to all six of the murders. He was indicted for the murder of one victim *484 and, upon the trial, defense counsel unsuccessfully sought a change of venue from the adjoining county to which the court had removed the trial. It appeared (1) that an exceedingly high percentage of the panel had been excused for cause on the ground that they had fixed opinions as to the defendant’s guilt; (2) that the “minds [of the jurors] were saturated by press and radio for months preceding [the trial] by matter designed to establish the guilt of the accused ” (366 U. S., at p. 730, per Frankfurter, J., concurring); and (3) that 8 of the 12 jurors selected to serve had acknowledged that they believed that the defendant was guilty—though, at the same time stating that they could render an impartial verdict. The Supreme Court, reversing the conviction, held that Irvin was denied the fair trial to which he was entitled under the Due Process Clause. “No doubt”, wrote the court (366 U. S., at p. 728), “ each juror was sincere when he said that he would be fair and impartial to petitioner, but the psychological impact requiring such a declaration before one’s fellows is often its father. Where so many, so many times, admitted prejudice, such a statement of impartiality can he given little weight. ’ ’ (Emphasis supplied.)
The situation presented by Irvin v. Dowd is, as already noted, thoroughly different from the one we are now considering. Here, there were 4 articles, only 2 of which had been read, and with varying degrees of attention, by 6 jurors, whereas in Irvin the jurors’ minds had been “ saturated * * * for months preceding” the trial by newspaper and radio reports to the effect that the accused had committed five murders in addition to the one for which he was tried.
Perhaps a day will come when either the courts will find a way to achieve a real balance between “ fair trial ” and “ free press ” or newspaper publishers will assume responsibility in the matter and see to it that their employees refrain from publishing accounts reflecting upon a defendant whose trial is imminent or actually in progress. (See Mueller, Problems Posed by Publicity to Crime and Criminal Proceedings, 110 IT. of Pa. L. Rev. 1, 10-12, 22-26.) Until such time, however, we must assess each case on its own facts. The ultimate and vital question for decision is whether the jurors were capable of rendering an impartial verdict and of deciding the case solely *485 on the proof received during the trial. On the record before us, we are convinced that the trial judge was justified in concluding that no juror was influenced against the defendant by any of the newspaper items and that each juror was able to render a fair and objective verdict according to the evidence. There is, therefore, no warrant for the defendant’s claim of prejudice.
The judgment appealed from should be affirmed.

. One story in particular, written by a widely read columnist, strongly reflects the latter’s opinion that the defendant was guilty not only of the crimes charged against him, but also that he was an underworld character who, with others, had engaged in a criminal conspiracy to control the fight game.

. Juror No. 7 stated that the articles left “ some impression ” on him adverse to the defendant, and No. 2 admitted that they would “ interfere * 9 * a little bit” with his being a fair and impartial juror — and both were excused.

. Since “ prejudice ” is a question of degree and its existence necessarily turns upon the particular facts of each case, nothing is to be gained from a discussion of Marshall v. United States (360 U. S. 310, supra) or other decisions (People v. Hryciuk, 5 Ill. 2d 176; State v. Bowden, 62 N. J. Super. 339, 360-363; State v. Claypool, 135 Wash. 295, 297-299) in which the newspaper accounts were held so grossly prejudicial as to render futile the juror’s assertion that he would not he influenced by what he had read and could and would decide the case solely on the basis of the evidence adduced.

. The defendant’s present claim that Juror No. 10 had declared that, in reaching a verdict, he would compare the trial testimony with the news items is not borne out by the record; as noted above, he stated that he would consider nothing but the evidence received in court.