THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v LEONARD MORDINO, Appellant.

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v DOMINIC TASCARELLA, Appellant.

THE PEOPLE OF THE STATE OF NEW YORK, Respondent, v ROBERT BROCATO, Appellant.

Fourth Department, July 12, 1977

*Harold J. Boreanaz (John F. Humann* of counsel), for Leonard Mordino, appellant.

*John F. Humann* for Dominic Tascarella, appellant.

*James P. Shea* for Robert Brocato, appellant.

*Edward C. Cosgrove, District Attorney (Judith Blake Manzella* of counsel), for respondent.

HANCOCK, JR., J. During the weekend recess in defendants' trial in Buffalo for murder, burglary and robbery, the local newspapers gave massive coverage to a series of sensational news stories unmistakably connecting the defendants to organized crime activities in the Buffalo area. The publicity, which occurred after the summations and before the court's final charge and while the jury was not yet sequestered, originated in a news release issued at a press conference by the Buffalo office of the Federal Bureau of Investigation. While we may

question the judgment of the newspapers in giving such prominent treatment to the news release—although of obvious potential harm to the defendants whose well-publicized trial was still in progress—we do not question their legal right to do so.[1]

The sole questions on this appeal relate to the assessment of the nature and extent of the harm to defendants and whether their rights to a fair trial were so impaired as to require a reversal. Under the peculiar circumstances of this case, we find there was at least a likelihood that some of the jurors had been influenced by the publicity so as to erode the defendants' rights to a "fair and objective verdict according to the evidence." *(People v Genovese,* 10 NY2d 478, 485; *Marshall v United States,* 360 US 310.) Accordingly, we reverse and direct a new trial, as a matter of discretion in the interest of justice, pursuant to CPL 470.15 (subd 3, par [c]). (See *People v Genovese, supra,* dissenting opn, DESMOND, J.; *Murphy v Florida,* 421 US 794, particularly concurring opn, BURGER, C.J.; *Irvin v Dowd,* 366 US 717; *Rideau v Louisiana,* 373 US 723; *Estes v Texas,* 381 US 532; *Sheppard v Maxwell,* 384 US 333; *Marshall v United States, supra.)*

On December 30, 1974, Robert Brocato, Dominic Tascarella and Leonard Mordino were indicted, charged with two counts of murder, burglary in the second degree and robbery in the first degree. The indictment stemmed from the death of one Charles Ing Wing, a 67-year-old laundry operator, who was found lying in the basement of his premises on June 11, 1971, bound and gagged. There was evidence of a struggle. Mr. Wing had apparently died of suffocation.

During the trial, which commenced on February 21, 1975, the evidence implicating defendants in the crime consisted primarily of the testimony of three witnesses—Mary Ann Lo Piccolo, Ruth Berdon and Anthony Marinaccio. Lo Piccolo and Berdon, both prostitutes, and accomplices in the crime who had been granted immunity, testified that they had "set up" Mr. Wing to be robbed by contacting defendant Tascarella. As witnesses to and participants in the planning, preparation for and execution of the robbery, they described these events and

---

1. See *Nebraska Press Assn. v Stuart* (427 US 539) and see *Craig v Harney* (331 US 367, 374), where the Supreme Court stated: "There is no special perquisite of the judiciary which enables it, as distinguished from other institutions of democratic government, to suppress, edit, or censor events which transpire in proceedings before it."

positively identified each of the defendants. The witness, Anthony Marinaccio, a government informant enrolled in the Federal witness protection program,[2] supplied the necessary corroboration for the testimony of the accomplices. Marinaccio testified to separate conversations during the summer of 1971 with the three defendants in which each admitted his connection with the Wing death.

It is clear from the record that agents from the Buffalo office of the Federal Bureau of Investigation commenced their own investigation into the Wing homicide in July of 1971 through the informant Marinaccio; that they had been deeply involved thereafter in the investigation; and that they had cooperated closely with the Buffalo police and the District Attorney's office in the preparation of the case for prosecution. Five FBI agents were called as witnesses. At all times during the trial, representatives of the FBI were present in the courtroom. Indeed, in his closing argument to the jury, the Assistant District Attorney referred to the "remarkable cooperation" * * * "of law enforcement efforts," and to those "spit and polish FBI agents and the hard-working Leo Donovan and Vince Tobia and Ed Stillwell [members of the homicide squad of the Buffalo police] who have been struggling with this case for three and a half years". "He commented further, "thank God they [the FBI] work well with the Buffalo Police Department and the Homicide Squad", and told the jury that "the FBI has been developing a collateral investigation into massive criminal activity, not just the Ing Wing homicide".

The People's summation, coming late in the afternoon on Friday, March 14, followed a strenuous three-week trial, involving the testimony of prostitutes and a paid informer, which had arisen from a brutal and lurid killing. The slaying and trial had received wide media attention. It seems unquestionable that under such circumstances the courtroom atmosphere on that Friday afternoon would have been charged with tension and emotion. The prosecutor's presentation was dramatic. Defense counsels' repeated objections to it as inflammatory and to his disparagements of their clients as "vultures" were overruled. At the conclusion of the summation the

---

2. On the first day of the trial, Anthony Marinaccio enrolled in the Federal witness protection program. Under this program, Anthony Marinaccio and his family—seven people—received new identities and $999 per month sustenance payments until he began working.

defendants moved for a mistrial citing, *inter alia,* its inflammatory nature, the references to "vultures" and, particularly, the "famous duck joke" which, counsel argued, was an unfair effort by the prosecution "to invoke guilt by association" and "guilt by classifcation." The "famous duck joke" refers to a story related by the prosecutor near the end of his summation: "that if you walk like a duck and you talk like a duck and you keep the company of ducks then you are a damn duck."

After the court's denial of the mistrial motion, the trial recessed at approximately 4:40 P.M. The jury was excused and instructed to return on Monday, March 17 for the court's final charge.

While the prosecution was concluding its summation, the *Buffalo Evening News,* final edition, carried the first of several articles covering the sensational FBI exposé concerning organized crime (referred to variously in the articles as the "syndicate", the "organization", the "mob", "Cosa Nostra", and "Mafia") in western New York. The front-page Friday evening story, capped by a page-wide, 84-point banner headline stating "FBI BREACHES MOB CRIME HERE", as well as a related account on the front page of the second section of the same edition of the *Buffalo Evening News,* and three separate front-page lead stories in the *Buffalo Courier-Express* on Saturday morning, Sunday morning, and Monday morning, in addition to the three-column article on the front page of the second section of the *Buffalo Evening News* of Saturday, March 15, 1975, were all based on information contained in a 28-page affidavit released by the FBI at a press conference held on Friday, March 14, 1975. On that day, the FBI and representatives of the United States Attorney's office, without advance notice, had obtained an ex parte order from the United States District Court Judge releasing the affidavit which, for a number of weeks, had been sealed by court order. Donald Hartnett, supervisor of the FBI's Organized Crime Division and United States Attorney Richard J. Arcara made oral statements at the press conference supplementing the affidavit; both were quoted repeatedly in the articles. Agent Hartnett, it should be noted, had appeared before the jury in the Wing murder trial only two days earlier as a witness on the next to last day of testimony.

The articles listed the names of members of the "council" or "board of directors" who were running organized crime in the

Buffalo area in place of Stephano Maggadino, the powerful "Mafia" leader, who had died the previous summer, as well as the names of many "lesser syndicate members." The "syndicate's" extensive illegal and profitable gambling and loan-sharking activities, the stories emphasized, were conducted primarily at two Buffalo "social clubs": Nairy's Social Club,[3] 314 W. Ferry Street, and Connecticut Hall, 374 Connecticut Street. The two clubs, according to the front-page Saturday morning *Courier-Express* account, were at the center of the Federal grand jury probe into "the gangland-slayings of reputed underworld figures John C. Cammilleri, Albert M. Billiteri, Jr. and Frank D'Angelo." FBI Agent Hartnett was quoted in the same article as stating that Cammilleri's murder "has been linked to alleged gambling and loansharking activity at [the] two West Side social clubs" and, further, as expressing a belief that "there was a connection between the murder and the takeover of his interest [Cammilleri's interest in Nairy's Social Club] by Sam Pieri".

Both papers made several references by name to two of the three defendants—Tascarella and Mordino. Friday's *Evening News* went so far as to identify them as "two defendants in the Ing Wing murder case now on trial in County *[sic]* Court" while Saturday's *Courier-Express,* in addition to naming the defendants, printed their pictures. The specific references to Tascarella and Mordino in two of the stories are as follows:

"Also observed in the clubs during the undercover investigation *were two defendants in the Ing Wing murder case now on trial in County Court, Dominic (Dim) Tascarella and Leonard Mordino.* According to informant Joseph Galioto, on Nov. 25 *Salvatore Bonito loaned Tascarella 'rake' money during a card game involving 11 players at Nairy's Social Club.*

"*Mordino is mentioned by Galioto in connection with another card game at the club June 27.*

"Galioto said he saw Mordino, who had won $2,200 at the game, pay the 'shift manager', Gasper Bona, $1,000 and

---

3. Nairy's Social Club was referred to during Mr. Cleary's cross-examination of Mary Mordino, a witness for defendant Mordino:

"Q. Your husband didn't go to the gambling casinos?

"A. No.

"Q. You know your husband gambles?

"A. No.

"Q. You know he's a member of the Nairy's Club, the Blue Banner Club?

"A. No."

instruct him to give the money to Mike Bona." (Buffalo Evening News, Friday, March 14, 1975, p 19; emphasis supplied) and further:

"The following persons were mentioned in the affidavit with either extremely sketchy or no identification:

"*Leonard Mordino,* Tony Fino, 'Cushie' Grillo, Dom Diati, Paul (Snuffy) Alessi, Ralph DeFavio, Charles Spataro, described as a Canadian arson escapee; Louis Marinaccio, Angelo Massaro, and 'Happy' Oliveri.

"Johnny D'Angelo, Tom Thomasula, Nicky Longo, Gordon D'Angelo, *Dominic "Dim" Tascarella,* Joe Calierie (Caleri), Iggy Danny DeJacemo, Tommy Miceli and Sam Frangiamore, described as a crime syndicate lieutenant" *(Buffalo Courier-Express,* Saturday, March 15, 1975, p 5; emphasis supplied).[4]

Along with the above-quoted Saturday article the *Courier-Express* displayed small individual full-face pictures of Tascarella and Mordino, each identified by the subject's name. Both the article and the pictures appeared under a full-page banner headline stating: "AFFIDAVIT NAMES MANY WHO HAD PREVIOUS RUN-INS WIH THE LAW". The same account contained similar-sized pictures of Salvatore Bonito, identified as a "Cosa Nostra member during the 1963 U.S. Senate subcommittee hearings", Danny Sansanese, Sr., reputed to be a "former enforcer for the Buffalo organized crime syndicate", Joseph Moses, "sentenced to seven years in jail after being convicted of masterminding an international heroin smuggling ring", William Sciolino, "described by FBI agents as an 'up and coming member' of the local crime family", John V. Cammilleri,[5] the "victim of a gangland style slaying" and Joseph DiCarlo, "a syndicate lieutenant * * * once described by police as Buffalo's 'public enemy No. 1' ".

When court reconvened on Monday, March 17, it, not surprisingly, was immediately faced with motions by all three defendants for a mistrial based on the prejudicial effect of the news stories, citing, among other things, the numerous references to Nairy's Social Club and the prosecution's "walk like a duck * * * keep the company of ducks" story with its implications of guilt by association, which had obviously taken on

---

4. These four paragraphs referring to Mordino and Tascarella were repeated verbatim on the front page of the second section of the *Buffalo Evening News* on Saturday, March 15, 1975. No pictures accompanied the article.

5. Cammilleri was referred to in one of the news articles by FBI Agent Hartnett as having had an interest in Nairy's Social Club.

added significance in light of the publicity associating the defendants with the members and leadership of the "Mafia". In five separate editions covering four days, the two Buffalo papers in an unrelenting barrage of front-page stories had unalterably linked two of the defendants with organized crime and with the leadership of the "Mafia" or "Cosa Nostra", which, the articles proclaimed, had been responsible for several gangland killings and were engaged in extensive loan-sharking and gambling operations in the area. In the light of the prosecutor's "walk like a duck * * * talk like a duck * * * keep the company of ducks" summation, the message could not escape even the least discerning juror—that the defendants, who were associated in the news articles with members of the "Mafia" or "Cosa Nostra", were themselves members of that organization and, therefore, criminals of the most vicious kind.

It may be that, in view of the inherently damaging nature of the news stories here, there was no possible way the court could have assured itself that the jurors were, in fact, not prejudiced. The procedure followed, however, in our opinion, could not have provided that assurance.

After submitting a written questionnaire to each of the jury members and ascertaining that jurors 1, 5 and 7 had noticed references to the defendants in some or all of the news articles the court excused the nine jurors who had responded that they had not seen the articles. It then proceeded to question jurors 1, 5 and 7 in open court in the presence of each other and of counsel. The interrogation was brief and, in some places, suggestive or leading.[6] The jurors were not sworn or examined singly in chambers. Nor were counsel permitted to participate in the examination.[7] From this examination the

---

6. For example:

"THE COURT: Do you tell us now that you can fairly and objectively decide the issues in this case without any consideration being given to anything that you might have read in the newspaper?

"MR. CUNNINGHAM: Yes, I can."

7. Compare *Marshall v United States* (360 US 310) where the Trial Judge, on learning that news accounts of the defendant's former felony convictions had been published during the trial, summoned the jurors into his chambers for examination one by one, and *People v Genovese* (10 NY2d 478), where the jurors were called singly before the bench, questioned by the court and by the prosecution and defense counsel, and cautioned not to speak to other jurors about the examination. (See *Nebraska Press Assn. v Stuart*, 427 US 539, 555 and *Sheppard v Maxwell*, 384 US 333, 362-363.)

court concluded that the jury was not prejudiced and denied the mistrial.[8]

We do not hold that on the basis of the limited inquiry conducted here a mistrial should have been granted; for it is the rule that publicity, even of the nature and magnitude of the type involved in this case, does not inevitably necessitate declaration of a mistrial. Such a result is warranted only in those instances where, after an exhaustive and probing inquiry of each affected juror, the court is of the belief that a fair and impartial determination cannot be reached.[9] It was in the denial of the mistrial without conducting such inquiry that the trial court erred. Had it examined the jurors individually, encouraged counsel at least indirectly to assist in the inquiry, and asked questions less leading in nature and more directed at uncovering hints of prejudice or patriality, it might properly have concluded that the publicity did not impair defendants' constitutional right to a fair trial (see *People v Genovese,* 10 NY2d 478, *supra).* However, in view of the abridged examination which the court chose to conduct, such a conclusion was, upon this record, impossible.

There is nothing in this record to suggest that the District Attorney was privy to knowledge of the FBI's plan to hold a news conference. We will accept the District Attorney's statement, as a public official and an officer of the court, that his

---

8. The court apparently disregarded the less than positive nature of the responses of juror Walters, viz.,

THE COURT: Whatever that reference was, just what is your state of mind now after having read what you did read? When you came to this jury you indicated you had a fair, objective mind and that you would decide the issues upon what you heard in the courtroom. Has what you read in any way changed that sense of objectivity, That sense of fairness?

MISS WALTERS: No, I don't believe it has.

THE COURT: It has not?

MISS WALTERS: No.

THE COURT: Do you feel that you can completely eliminate from your consideration in this case anything that you may have seen in the newspapers?

MISS WALTERS: I think so.

THE COURT: Will you do that?

MISS WALTERS: Yes.

9. While the constitutional guarantee of a fair trial requires that a defendant's guilt be adjudicated by a panel of impartial and indifferent jurors, this standard has never been raised to a point of compelling total extrajudicial ignorance of the facts and issues involved *(Murphy v Florida,* 421 US 794, 799-800; *Irvin v Dowd,* 366 US 717, 722). "It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court" *(Irvin v Dowd, supra,* p 723).

office knew nothing of it. The same cannot be said for the FBI and the other police authorities who may have been involved. At the very least, given their daily contact with the progress of the trial, they displayed ineptitude of surprising proportions. In any event, we condemn such conduct in the strongest terms.

Although none of the articles mentioned the defendant, Brocato, he, as one who had been tried with Mordino and Tascarella as an accessory pursuant to article 20 of the Penal Law, and who, the prosecution vehemently argued, had acted with the other two in furtherance of a common design, was also clearly prejudiced.

The conclusion that a new trial must be granted in view of the extraordinary nature and extent of the publicity and the insufficient steps taken to obviate its damaging effects is supported by the authorities cited above. We note particularly the concurring opinion of Chief Justice BURGER in *Murphy v Florida* (421 US 794, 804, *supra*) to the effect that, although he agreed that the circumstances of the trial did not involve an impairment of the defendant's constitutional rights, he would not have hesitated to "reverse petitioner's conviction in the exercise of supervisory powers" had it been a Federal case; and see *Marshall v United States* (360 US 310, *supra*) where the United States Supreme Court granted a new trial in the exercise of its supervisory function over Federal courts because some of the jurors had read newspaper articles indicating that the defendant, who was being tried for a drug charge, had two previous felony convictions. There, as here, the trial was in progress and the jurors had assured the court that they would not be influenced by the articles.[10]

The Supreme Court in discussing the fair trial—free press dilemma in criminal cases has held in *Nebraska Press Assn. v Stuart* (427 US 539, *supra*) that the First Amendment rights of the press and the public and the right of an accused to a fair trial under the Sixth Amendment are coequal and that one does not take precedence over the other.[11] Under *Nebraska* the Judges and lawyers in discharging their responsibilities to secure a defendant's Sixth Amendment rights, may not, except in extraordinary circumstances, employ "gag orders" or prior restraints but must rely, instead, on other

---

10. See also *People v Genovese* (10 NY2d 478, 485, dissenting opn, DESMOND, J.)

11. *Nebraska Press Assn. v Stuart* (427 US 539, 555).

protective measures such as the questioning and admonition of jurors. Where, as here, the press, in the exercise of its prerogative, chooses to print information that is inherently damaging and the steps taken to protect the rights of the accused are insufficient and ineffectual, we must resort to the only other measure available—a new trial with all its attendant uncertainties.[12]

In view of this decision, it is unnecessary to pass on the other issues raised by appellants. We note, however, that respondent frankly concedes in its brief, and we concur, that some of the prosecuting attorneys' remarks on summation should have been tempered and some omitted entirely. In particular, the characterization of the defendants as "vultures" and the so-called "duck joke" were improper. Such remarks should have been stricken with appropriate instructions to the jury to disregard them.

In all the circumstances the judgments should be reversed and a new trial granted.

MOULE, J. P., SIMONS and GOLDMAN, JJ., concur.

Judgments unanimously reversed, on the law and facts, and new trial granted.

